USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 11/21/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NEMESIS 2 LLC,

                Plaintiff,

v.

ROBERT PALADINO, ANDRE ROLA CABRAL, PASCAL SALVATI AND PURE BRAZILIAN COMPANY, S.L.,

                Defendants.

No. 19-CV-3373 (RA)

MEMORANDUM OPINION AND ORDER

---

RONNIE ABRAMS, United States District Judge:

    Plaintiff Nemesis 2 LLC brings this action against Defendant Pure Brazilian Company S.L. for breach of a promissory note obligation and Defendants Robert Paladino, Andre Rola Cabral, and Pascal Salvati for breach of their guarantee obligations. On May 25, 2018, after Plaintiff agreed to loan Pure Brazilian $400,000, Pure Brazilian executed the promissory note (the "Note") guaranteeing repayment of that loan. That same day, Paladino, Rola Cabral, and Salvati executed guarantees of that Note. Although the Note became due and owing in September 2018, neither Pure Brazilian nor the guarantors have paid it. Plaintiff filed this action to recover the amount owed to it.

    Before the Court now are cross-motions for summary judgment filed by Plaintiff and Paladino. The parties do not dispute the facts, but nonetheless disagree about whether the guarantee applies to Paladino after he resigned from Pure Brazilian when the debt became due prior to his resignation. The Court concludes that it does. Accordingly, and for the following reasons, Plaintiff's motion is granted, and Paladino's motion is denied.

## BACKGROUND

I. **Factual Background**

A. **Promissory Note & Guarantees**

Plaintiff agreed to loan $400,000 to Pure Brazilian. On May 25, 2018, Pure Brazilian executed and delivered the Note to Plaintiff, in which Pure Brazilian promised to repay the loan, plus interest of 15% per annum accruing from the date of the Note, and pay a Structuring Fee of $150,000 by the Note's "Maturity Date."[1] The "Maturity Date," as relevant here, was defined as "the date that is one hundred twenty (120) calendar days from the date of this Note." Bull Decl., Ex. A at 3 (Dkt. 27). As a "condition[] precedent" to making the loan, the Note stated that Plaintiff "shall have received the Unconditional Guarantees, duly executed by each Guarantor." Bull Decl., Ex. A at 4.

The three individual Defendants – Paladino, Rola Cabral, and Salvati – agreed to serve as the guarantors of the Note. At the time, Paladino was the "Chief Executive Officer of Pure Brazilian LLC, a wholly owned subsidiary of the Borrower," Bull Decl., Ex. B at 1, and Rola Cabral and Salvati had ownership interests in Pure Brazilian, Bull Decl., Exs. C & D. On the same day that the Note was executed, Paladino, Rola Cabral, and Salvati each executed a separate guarantee, in which they individually agreed to "secure the prompt and complete payment, observance and performance of all of the obligations of the Borrower [Pure Brazilian] under the Note in an aggregate amount not to exceed Six Hundred Thousand U.S. Dollars ($600,000)." Bull Decl., Exs. B, C, D at 1.

---

[1] The Note provided that "the Structuring Fee shall be waived and not payable by the Borrower if the Loan is paid off using proceeds of the Secured Financing Transaction." Bull Decl., Ex. A at 4. Because the loan was not paid off, the Structuring Fee must still be paid. *See* Def.'s Rule 56.1 Stmt. ¶ 9.

The guarantees provide that, "[i]n the event the Noteholder makes a demand upon the Guarantor under this Guarantee, the Guarantor shall be held and bound to the Noteholder directly as debtor in respect of the payment of the amounts hereby guaranteed." Bull Decl., Exs. B, C, D at Section 11. Each guarantee describes the obligation as "continuing" and "operative and binding until the Guaranteed Obligations shall have been paid in full in cash (or as otherwise agreed in writing by the Noteholder), at which time this Guarantee shall terminate." Bull Decl., Exs. B, C, D at Section 3. The three guarantors also agreed to "absolutely, unconditionally and irrevocably waive[] any and all right to assert any defense (other than the defense of payment in cash in full), set-off, counterclaim or cross-claim of any nature whatsoever with respect to this Guarantee or the obligations of the Guarantor under this Guarantee." Bull Decl., Exs. B, C, D at Section 4.

Paladino's guarantee, however, differed from Rola Cabral's and Salvati's guarantees in one way. Section 2 of Rola Cabral's and Salvati's guarantees states:

> The Guarantor, hereby unconditionally and irrevocably guarantees to the Noteholder the prompt and complete payment and performance of all the Guaranteed Obligations.

Bull Decl., Exs. C, D. By contrast, Section 2 of Paladino's guarantee provides:

> The Guarantor, from the date hereof and for so long as Guarantor serves as Chief Executive Officer of, or is otherwise an employee or consultant to, the Borrower, PB LLC or any of the Company's affiliates or other direct or indirect subsidiaries, hereby unconditionally and irrevocably guarantees to the Noteholder the prompt and complete payment and performance of all of the Guaranteed Obligations.

Bull Decl., Ex. B.

**B. Subsequent Events**

On May 29, 2018, Plaintiff wired $400,000 to Pure Brazilian, and the Note became due and owing on September 24.[2] This date, however, passed without Pure Brazilian making a payment. On September 29, Paladino e-mailed two of Plaintiff's officers acknowledging that the Note was due and that "[w]e have been working diligently to secure a transaction with several people or firms that will enable use to retire this note." Bull Decl., Ex. F. He also wrote that he "remained [Plaintiff's] primary contact." Bull Decl., Ex. F.

On October 1, via e-mail to Paladino, Plaintiff notified Pure Brazilian that it had defaulted on the Note and demanded immediate payment: "The Maturity Date has now passed and the outstanding principal balance, accrued and unpaid interest, and the Structuring Fee are due and owing. However, as of the date hereof, the Borrower has not paid the amounts due and owing to the Noteholder." Bull Decl., Ex. G. Because "an Event of Default under the Note has occurred and is continuing," "demand is hereby made for your immediate payment." Bull Decl., Ex. G.

On November 7, with Pure Brazilian not responding to the payment demand, Plaintiff wrote to the three guarantors. Bull Decl., Exs. H, I, J. In its email to Paladino – identical to its emails to Rola Cabral and Salvati – Plaintiff notified Paladino of the Note's default and demanded that he comply with his guarantee obligation "on or before November 30, 2018":

> The Maturity Date has now passed and the outstanding principal balance, accrued and unpaid interest, and the Structuring Fee are due and owing. However, as of the date hereof, the Borrower has not paid the amounts due and owing to the Noteholder. . . . The aforesaid principal balance, accrued and unpaid interest, and the Structuring Fee are

---

[2] September 22 was 120 days after the Note's execution and thus the Note's "Maturity Date." However, September 22 was a Saturday and the Note provided that, "[w]henever any payment to be made hereunder shall be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day." Bull Decl., Ex. A at Section 6.3. Accordingly, September 24 was the date on which Pure Brazilian was required to pay the Note.

4

> "***Guaranteed Obligations***" under your Guarantee that you are presently obligated to pay to the Noteholder in an aggregate amount not to exceed Six Hundred Thousand U.S. Dollars (U.S. $600,000.00) pursuant to your Guarantee.

Bull Decl., Ex. H.

Approximately a week after Plaintiff's payment demand, on November 15, Paladino resigned, effective immediately, from his position as CEO of Pure Brazilian's subsidiary. Paladino Aff., Ex. A (Dkt. 40-1). To date, neither Pure Brazilian nor any of the guarantors has paid the amount due pursuant to the Note.

## II. Procedural History

On February 12, 2019, Plaintiff filed this action against Pure Brazilian and the three guarantors in the Supreme Court of New York seeking to recover the total amount owed to it. Paladino was the only Defendant to appear, and he removed the action to this Court on April 4.

Since removal, Paladino has remained the only Defendant to appear.[3] On June 21, Plaintiff moved for a default judgment against Pure Brazilian. After an order to show cause hearing was held at which no one appeared on Pure Brazilian's behalf, the Court granted the motion, entered a default judgment, and awarded Plaintiff $647,783.56 – the amount owed to it for the unpaid loan, Structuring Fee, and accrued interest.

Although Plaintiff already received damages and "seek[s] a single recovery of the amounts due and owing pursuant to the Note," it continues this action because the individual Defendants are "jointly and severally liable to Plaintiff" with Pure Brazilian. Pl.'s Mot. at 2 n.1. In May, Plaintiff and Paladino requested permission to file the instant summary judgment motions.

---

[3] Plaintiff acknowledges that Rola Cabral and Salvati, who "reside in foreign countries," "have not been served with process." Pl.'s Mot. at 2 n.1. The action is thus dismissed as to Rola Cabral and Salvati, without prejudice. *See* Fed. R. Civ. P. 4(m).

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of demonstrating the absence of a question of material fact." *Chaparro v. Kowalchyn*, No. 15-CV-1996 (PAE), 2017 WL 666113, at *3 (S.D.N.Y. Feb. 17, 2017). In resolving a summary judgment motion, the Court must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Mitchell v. City of New York*, 841 F.3d 72, 77 (2d Cir. 2016).

Under New York law, which the parties agree applies here, *see* Def.'s Rule 56.1 Stmt. ¶ 26, guarantees are subject to traditional contract interpretation principles. *See Banco Portugues do Atlantico v. Asland, S.A.*, 745 F. Supp. 962, 967-68 (S.D.N.Y. 1990) ("[A] surety is not entitled to any particular tenderness in the interpretation of the language of the contract."). "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms," *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990), and "unambiguous provisions . . . must be given their plain and ordinary meaning," *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007). But whether a provision is ambiguous is a question of law resolved by asking if "a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). "[I]n deciding whether an agreement is ambiguous courts 'should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.'" *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998) (citation omitted). Only if there is ambiguity may a court refer to extrinsic evidence of the contracting

parties' intent. *See Consol. Rail Corp. v. Primary Indus. Corp.*, 901 F. Supp. 765, 768 (S.D.N.Y. 1995).

## DISCUSSION

### I. The Parties' Conflicting Interpretations of Paladino's Guarantee

"A valid guaranty [is] a written instrument guaranteeing payment of another's debt, describing with precision the obligation to which the person is bound." *Export-Import Bank of U.S. v. Agricola Del Mar BCS*, 536 F. Supp. 2d 345, 350 (S.D.N.Y. 2008). To establish a guarantor's liability for default, a plaintiff must show that (1) there is an underlying obligation that has not been paid; (2) there is a guarantee of that underlying obligation; and (3) the guarantor has failed to make payment in accordance with the guarantee's terms. *See Consol. Rail Corp.*, 901 F. Supp. at 768.

Much of this is not in dispute here. The parties agree there is an underlying obligation – the Note – and that it has not been paid by either the borrower Pure Brazilian or the guarantors. They also agree that Paladino served as a guarantor of the Note. At issue then is only to what extent Paladino agreed to be a guarantor. In particular, the parties dispute whether Paladino is liable as a guarantor for the Note even after his employment with Pure Brazilian ended, given that it became due prior to his resignation. This dispute stems from the language in Section 2 of Paladino's guarantee:

> The Guarantor, from the date hereof and *for so long as Guarantor serves as Chief Executive Officer of, or is otherwise an employee or consultant to, the Borrower, PB LLC or any of the Company's affiliates or other direct or indirect subsidiaries*, hereby unconditionally and irrevocably guarantees to the Noteholder the prompt and complete payment and performance of all of the Guaranteed Obligations.

Bull Decl., Ex. B (emphasis added).

7

Plaintiff argues that, when evaluating the guarantee in its entirety, "the plain purpose and object of the Paladino Unconditional Guarantee was to obligate the Guarantor Paladino for the payment to Plaintiff of any and all of the Guaranteed Obligations that became due and owing *during* Paladino's tenure as CEO." Pl.'s Reply Memo. at 4 (emphasis added). Therefore, because "[i]t is uncontroverted that the Guaranteed Obligations were due and owing some seven or eight weeks before Defendant Paladino . . . resigned," he cannot avoid that liability simply by resigning. Pl.'s Mot. at 7.

By contrast, Paladino argues that Section 2 makes his "obligations and/[or] the enforceability thereof . . . dependent on his status with the Defendant Borrower and its subsidiaries and affiliates." Def.'s Mot. at 4. "Under the plain language of the Paladino Unconditional Guarantee it makes no difference whether the Defendant Borrower's default under the Note occurred prior to or after the cessation of ties" because "[a]ny obligations [he] had were extinguished by the cessation of ties." Def.'s Mot. at 4. Adopting Paladino's interpretation would mean that, once he resigned on November 7, he was no longer liable for the Note.

## II. Section 2 is Arguably Unambiguous

Turning first to the focus of the parties' disagreement, it is clear that Section 2 cabins Paladino's guarantee of the Note in some respect. *See Cinerama, Inc. v. Sweet Music, S.A.*, 355 F. Supp. 1113, 1119 (S.D.N.Y. 1972) ("[A] guarantor can limit the scope of its guarantee."), *rev'd in part*, 482 F.2d 66 (2d Cir. 1973). The text of Section 2 limits his guarantee to Plaintiff in that it applies only "from the date hereof and for so long as Guarantor serves as Chief Executive Officer of, or is otherwise an employee or consultant to, the Borrower, PB LLC or any of the Company's affiliates or other direct or indirect subsidiaries." Bull Decl., Ex. B. The importance of this limiting language is particularly evident when contrasting Section 2 across all

three guarantees.[4] Unlike Section 2 of Paladino's guarantee, Section 2 of Rola Cabral's and Salvati's guarantees broadly provides that they "unconditionally and irrevocably guarantee[] to the Noteholder the prompt and complete payment and performance of all of the Guaranteed Obligations." Bull Decl., Exs. C, D.

As such, Paladino rightly notes that there is a significant textual difference between the guarantees that reflects "[t]he parties inten[tion] that Paladino be treated differently." Def.'s Mot. at 5. By linking Paladino's obligation as a guarantor to his employment with Pure Brazilian, Section 2 establishes that Paladino would not be responsible for "the prompt and complete payment and performance of all of the Guaranteed Obligations" if Pure Brazilian defaulted on the Note *after* he resigned. Bull Decl., Ex. B. This conclusion, however, does not resolve the issue at hand: whether Paladino, who became responsible for the Note's default *during* his employment with Pure Brazilian, could be released from that obligation by resigning.

Section 2 is most naturally read in Plaintiff's favor. By requiring "the prompt and complete payment and performance of all of the Guaranteed Obligations," Paladino was required to fulfill his guarantee obligation as soon as that obligation was triggered. Bull Decl., Ex. B. Accordingly, as of November 7, when Plaintiff notified Paladino of Pure Brazilian's default on the Note and demanded compliance with his guarantee obligation, he became "unconditionally and irrevocably" bound to that obligation. Bull Decl., Ex. B. The language in the guarantee offers little support for Paladino's assertion that he may be released from an already-triggered

---

[4] In interpreting Paladino's guarantee, the Court may consider the Note and the guarantees of Rola Cabral and Salvati. "In New York, it is the general rule that written contracts executed simultaneously and for the same purpose must be read and interpreted together." *Liberty USA Corp. v. Buyer's Choice Ins. Agency LLC*, 386 F. Supp. 2d 421, 425 (S.D.N.Y. 2005). The Note and three guarantees were executed on the same day for the same purpose of securing the repayment of the loan that Plaintiff made to Pure Brazilian. Moreover, the Note specifically refers to the three guarantees, explaining that "receiv[ing] the Unconditional Guarantees, duly executed by each Guarantor," is a "[c]ondition[] precedent" to advancing the loan. Bull Decl., Ex. A. at 2, 4.

9

obligation whenever he might choose to stop working for Pure Brazilian. His assertion also makes little sense as a practical matter.

Nonetheless, even if the Court assumed *arguendo* that Section 2 – when read in isolation – is ambiguous as to this issue, reading Section 2 in context of the whole guarantee leaves no doubt that Paladino remains liable for the Note's default.

## III. The Guarantee in its Entirety is Unambiguous

Even if the Court were to find that Section 2 is ambiguous, that conclusion is not dispositive. "The rules of contract interpretation . . . do not contemplate considering any provision of the contract in isolation." *U.S. ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cty.*, 712 F.3d 761, 767 (2d Cir. 2013). Rather, "the task of the court 'is to determine whether such clauses are ambiguous when read in the context of the entire agreement.'" *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (citation omitted). Considering "the context of the entire agreement," *id.*, the guarantee establishes that once Paladino becomes responsible for the unpaid Note, that debt is binding.

First, Section 11 provides:

> Payment of sums due hereunder shall be made by the Guarantor immediately upon demand by the Noteholder. In the event the Noteholder makes a demand upon the Guarantor under this Guarantee, the Guarantor shall be held and bound to the Noteholder directly as debtor in respect of the payment of the amounts hereby guaranteed.

Bull Decl., Ex. B. Section 11 makes clear that Plaintiff's demand triggers Paladino's responsibility to pay the Note – and to do so "immediately." Bull Decl., Ex. B. Moreover, the Note established that, upon the demand, Paladino "shall be held and bound" to this debt. Bull Decl., Ex. B. The parties do not dispute that Plaintiff demanded payment from Paladino via e-mail on November 7, 2018. *See* Def.'s Rule 56.1 Stmt. ¶ 3, 11, 22. They also agree that Paladino remained employed by Pure Brazilian on that date. *See* Pl.'s Reply Rule 56.1 Stmt. ¶

10

28. As a result, pursuant to Sections 2 and 11, Paladino was required, as of November 7, to immediately pay the defaulted Note and subsequently remained "bound to [Plaintiff] directly as debtor."[5] By requiring immediate payment and binding him instantly to that debt, Section 11 makes clear that Paladino could not be relieved from his guarantee once a demand was made, contrary to Paladino's assertion.

Furthermore, several other sections describe Paladino's responsibility to pay the Note pursuant to his guarantee, once triggered, as binding. Section 3, for instance, states:

> Notwithstanding any other provision hereof, whether any proposed guarantor or any other Person shall become in any other way responsible to the Noteholder for or in respect of the Guaranteed Obligations or any part thereof, and regardless of whether or not any Person now or hereafter responsible to the Noteholder for the Guaranteed Obligations or any part thereof, whether under this Guarantee or otherwise, shall cease to be so liable, the Guarantor hereby declares and agrees that this Guarantee shall be a continuing guarantee and shall be operative and binding until the Guaranteed Obligations shall have been paid in full in cash (or as otherwise agreed in writing by the Noteholder), at which time this Guarantee shall terminate.

Bull Decl., Ex. B. This text unambiguously provides that, once Paladino became "responsible to [Plaintiff] for or in respect of the Guaranteed Obligations or any part thereof," this was "a continuing guarantee" that remained "binding until the Guaranteed Obligations" are fully paid. Bull Decl., Ex. B.

Similarly, Section 6 includes a no-release provision, which first explains the parties' intent: "[I]t being the purpose and intent of the Guarantor and the Noteholder that the covenants, agreements and all liabilities and obligations of the Guarantor hereunder are absolute, unconditional, and irrevocable under any and all circumstances." Bull Decl., Ex. B. Subsequently, Section 6 provides that "the Guarantor agrees that until this Guarantee is fully

---

[5] To the extent that Paladino argues that he did not become liable because Plaintiff demanded payment be made "on or before November 30, 2018" – a date after he resigned – that argument is unpersuasive. Bull Decl., Ex. H. Section 11 plainly states that the guarantor becomes liable upon "the Noteholder mak[ing] a demand upon the Guarantor." Bull Decl., Ex. B.

11

performed, and without possibility of recourse, whether by operation of law or otherwise, the Guarantor's undertakings hereunder shall not be released, in whole or in part." Bull Decl., Ex. B.

Finally, further evidence of the parties' intent to bind Paladino to a debt upon a payment demand is Section 4's unconditional waiver of defenses, in which Paladino agreed to "absolutely, unconditionally and irrevocably waive[] any and all right to assert any defense (other than the defense of payment in cash in full), set-off, counterclaim or cross-claim of any nature whatsoever with respect to this Guarantee or the obligations of the Guarantor under this Guarantee."[6] Bull Decl., Ex. B.

Reading the guarantee in its entirety, the Court cannot ignore the clear language establishing that once Paladino became responsible under the guarantee for the Note's default, that the responsibility to pay that debt was binding. "[W]ords and phrases [in a contract] should be given their plain meaning." *Olin Corp. v. Am. House. Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012). Moreover, the Court must interpret the guarantee so that "every provision of a contract or, in the negative, no provision of a contract should be left without force and effect." *Muzak Corp v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (1956); *see also Law Debenture Tr. Co.*, 595 F.3d at 467 ("[T]he court should not find the contract ambiguous where the interpretation urged by one party would 'strain[] the contract language beyond its reasonable and ordinary meaning.'" (citation omitted)).

---

[6] A broad defense waiver like this is valid and enforceable so long as a contract is entered into voluntarily and knowingly. *See Export-Import Bank of U.S.*, 536 F. Supp. 2d at 350. Section 14 of Paladino's guarantee states that "[t]he Guarantor hereby acknowledges that the Guarantor has either obtained the advice of counsel or has had the opportunity to obtain such advice in connection with the terms and provisions of this Guarantee." Bull Decl., Ex. B (capitalization altered); *see also* Def.'s Rule 56.1 Stmt. ¶ 24 (acknowledging that he agreed to this waiver).

With these basic principles in mind, the Court rejects Paladino's assertion that his guarantee obligation could be "extinguished by the cessation of ties" with Pure Brazilian. Def.'s Mot. at 4-5. Nowhere does the guarantee give Paladino this "escape hatch," as Plaintiff refers to it. Pl.'s Mot. at 7. Although Section 2 limited at what point Paladino could become responsible for a default on the Note, it did not provide him a release from responsibility imposed while he was still employed. Rather, the guarantee "makes clear the parties' over-all intention" to creating a binding debt so long as Paladino's guarantee obligations were triggered while he was employed. *Kass*, 91 N.Y.2d at 567. To hold otherwise would ignore or render meaningless several sections in the guarantee.

It would also have the negative consequence of "[p]ermit[ting] guarantors, who are often in a far better position to perceive problems than are lending institutions, to withdraw *because* they become aware of reasons for concern." *P.T Bank Cent. Asia v. Wong*, 901 F. Supp. 572, 580 (E.D.N.Y. 1995). Such a result would risk "depriv[ing] guarantees of all value." *Id.*; *see also Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (explaining that contracts must be read with "the business purposes sought to be achieved by the parties" in mind). To accept Paladino's interpretation would permit just this: It would mean that, although Plaintiff made the loan assuming Paladino's guarantee was a security for repayment, Paladino could renege on that guarantee after he was alerted that payment was due. Such an interpretation is both unreasonable and unfounded based on the guarantee's text. *See Samba Enters., LLC v. iMesh, Inc*, No. 06-CV-7660 (DC), 2009 WL 705537, at *5 (S.D.N.Y. Mar. 19, 2009) ("A court should not interpret a contract in a manner that would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'" (citation omitted)).

Accordingly, the Court holds that the guarantee's text, when evaluated in its entirety, is unambiguous. Paladino is liable as a guarantor of the Note for the Note's default because Paladino was still employed by Pure Brazilian when (1) Pure Brazilian defaulted on the Note, and (2) Plaintiff made a payment demand on Paladino.

## IV. Reference to Extrinsic Evidence is Inappropriate

Consequently, the Court rejects Paladino's assertion that it must consider extrinsic evidence. *See* Def.'s Mot. at 1-2. "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *Kass*, 91 N.Y.2d at 566. As explained above, the guarantee is not ambiguous when considered in its entirety. Instead, Paladino has tried to use extrinsic evidence to *create* ambiguity. In doing so, however, he incorrectly asserts – in reliance on *Kass v. Kass*, 91 N.Y.2d 554 (1998) – that "a court may examine uncontested extrinsic evidence provided that . . . it relates to the context of the agreement." Def.'s Mot. at 1. But *Kass* does not stand for this proposition. Rather, *Kass* states the well-established contract principle that if a contract is unambiguous, then a court should not look beyond its four corners to resolve the dispute. *See id.* at 566-67. Because "the intent of the parties can be gleaned from the face of the instrument," the Court will thus not consider extrinsic evidence here. *Teitelbaum Holdings v. Gold*, 48 N.Y.2d 51, 56 (1979). Finally, Paladino fails to acknowledge that his guarantee includes a merger clause in Section 16. *See* Bull Decl., Ex. B. Under New York law, "[t]he merger clause . . . evinc[es] the parties' intent that the agreement 'is to be considered a completely integrated writing.'" *Jarecki v. Shung Moo Louie*, 95 N.Y.2d 665, 669 (2001) (citation omitted).

## V. Plaintiff is Entitled to Summary Judgment as a Matter of Law

Because no material facts are in dispute and the Court holds that Paladino remains obliged to secure the Note's payment, Plaintiff is entitled to summary judgment for Paladino's breach of his guarantee obligation. To hold a guarantor liable for breach, Plaintiff must show that "[1] a third party owes the plaintiff a debt, [2] the defendant guaranteed payment of that debt, and [3] the debt has not been paid by the third party of defendant." *Overseas Private Inv. Corp. v. Gerwe*, No. 12-CV-5833 (RA), 2016 WL 1259564, at *5 (S.D.N.Y. Mar. 28, 2016). None of this is in dispute. First, the parties agree that Pure Brazilian still owes Plaintiff the amounted promised to it in the Note. *See* Def.'s Rule 56.1 Stmt. ¶ 12-13. The Court already held this in its default judgment ruling against Pure Brazilian. *See* Dkt. 57. Second, for the reasons explained above, Paladino remains a guarantor of that debt despite his November 15, 2018 resignation. Third, the parties agree that Paladino has not paid that debt. *See* Def.'s Rule 56.1 Stmt. ¶ 23. Accordingly, there is no genuine dispute of fact that Paladino breached his guarantee obligation, and he is thus liable for up to $600,000 of the amount owed to Plaintiff pursuant to the Note.

## CONCLUSION

For the foregoing reasons, Plaintiff's summary judgment motion is granted, and Defendant's summary judgment motion is denied. The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 26 and 39, and close this case.

Dated: November 21, 2019
New York, New York

RONNIE ABRAMS
United States District Judge